**In the Matter of Lorraine BLILIE.**

No. C6–91–2444.

Court of Appeals of Minnesota.

April 14, 1992.

Review Granted June 17, 1992.

Peter M. Rosene, Rosene & Haugrud, Chartered, St. Paul, for appellant Blilie.

Tom Foley, Ramsey County Atty., Richard H. Hoffman, Asst. County Atty., Hubert H. Humphrey, III, Atty. Gen., David

P. Iverson, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by RANDALL, P.J., and HUSPENI and SHORT, JJ.

## OPINION

HUSPENI, Judge.

Lorraine Blilie appeals from the trial court's denial of her petition for a declaratory judgment, an injunction, and an order to show cause. The Commissioner of Human Services moves to dismiss a portion of the appeal as moot, and appellant moves to clarify the record. Ramsey County informed the court that it would not be filing a brief, but, pursuant to this court's request at oral argument, it submitted information as to the status of the pending petition for commitment. We affirm.

## FACTS

Appellant was born in 1938. On January 10, 1952, a petition was filed to commit her as mentally deficient, citing as grounds her inability to make a good adjustment at school, where she was making few friends and doing poorly. On January 23, 1952, the court found appellant mentally deficient, appointed the director of public institutions guardian of her person, and committed her to its care and custody.[1]

Pursuant to Minn.Stat. § 253B.12 (1984), a hearing was held in 1984 on the continued judicial commitment of appellant as a mentally retarded person. At that time, she was a patient at the Cambridge State Hospital. Appellant was diagnosed as mentally retarded and schizophrenic, and has had a lobotomy. She was being treated with various types of neuroleptic medication. The court in 1984 found appellant was likely to fail to provide necessary food, clothing, shelter, and medical care unless involuntary commitment was continued. It also found her maladaptive behavior, which included aggression towards others, pulling fire alarms, and, three years previously, lighting a fire, prevented her placement in the community. The trial court found appellant continued to be mentally retarded and ordered her commitment for an indeterminate period.

Another hearing was held in 1987 pursuant to *In re Harhut*, 385 N.W.2d 305, 312 (Minn.1986), in which the supreme court required that all indeterminate commitments for mentally retarded persons be reviewed at least every three years. The court in 1988 found appellant needed 24-hour supervision and care, that she had delusional thinking and loose associations, she was aggressive towards others at times, and her conduct, along with her mental illness, severely hampered her placement in the community. Appellant was being treated with neuroleptics, and the court found a *Jarvis* order was required to continue such treatment. The trial court terminated appellant's prior indeterminate commitment and recommitted her as a mentally retarded person through March 12, 1990 to Cambridge Regional Treatment Center.

In 1990, another petition for the judicial commitment of appellant as a mentally retarded person was brought. The court found that she was diagnosed with mild mental retardation, conduct disorder, and schizophrenia. Her mental illness was being treated with a neuroleptic medication, with consent obtained through Ramsey County without a *Jarvis* hearing. Evidence indicated appellant could be placed in the community. The court concluded that appellant was a mentally retarded person, but that involuntary hospitalization commitment was not necessary. It found appellant should be placed in the community and that only a lack of funding precluded such placement. In an order dated August 17, 1990, the court denied the petition for judicial commitment. Appellant nonetheless remained at Cambridge, apparently because no appropriate community placement was available.

---

**1.** Blilie is currently subject to the guardianship of the Commissioner of Human Services pursuant to Minn.Stat. ch. 252A (1990). The Commissioner has delegated that authority to Ramsey County Social Services pursuant to Minn.Stat. § 252A.111, subd. 5.

A new petition dated September 26, 1990 for the judicial commitment of appellant as mentally retarded or mentally ill was brought. The court again found appellant was mentally retarded or mentally ill, but that involuntary hospitalization and commitment was not necessary for her protection. The court found that since the prior court order of August 17, 1990, appellant's condition had not changed, and that community placement was apparently being delayed by lack of funding, which it determined was not a reason to commit appellant to Cambridge. Appellant remained at Cambridge for lack of an appropriate community placement.

On May 29, 1991, appellant's counsel petitioned the district court pursuant to Minn. Stat. § 252A.19, subd. 2 (1990) asking, first, that the court issue a declaratory judgment holding that the original appointment of the Commissioner[2] as guardian of appellant was terminated in 1968 by repeal of Minn.Stat. § 525.753 (1949), under which the guardianship was commenced; second, that the court declare Minn.Stat. § 253B.03, subd. 6a (Supp.1991), which authorizes treatment of individuals with developmental disabilities with neuroleptic medication upon guardian consent without further court review, to be unconstitutional; and third, that the court order the Commissioner to show cause why she continued to provide residential services to appellant at Cambridge Regional Human Services Center without a commitment. The trial court denied the petition in its entirety and Blilie appealed.

The Commissioner moves to dismiss the appeal as moot in part because appellant has since been placed in residence in the community, and the Commissioner is no longer providing residential services or neuroleptic medications to her. Appellant opposes the motion, and also moves for clarification of the record, which the Commissioner opposes.

On November 20, 1991, a new commitment petition was brought in district court.

Ramsey County has since informed this court that it has stipulated to withdraw the petition.

## ISSUES

1. Did appellant's public guardianship, which was created under Minn.Stat. § 525.-753 (1949), expire upon the repeal of the statute?

2. Does Minn.Stat. § 253B.03, subd. 6a (Supp.1991) violate the ward's constitutional right to privacy by authorizing her treatment as an individual with developmental disabilities with neuroleptic medication upon guardian consent, where she is under public guardianship and resides in the State Regional Treatment Center?

3. Did the district court err by denying appellant's request for an order directing the Commissioner of Human Services to show cause why she continued to provide residential services to appellant?

## ANALYSIS

### I.

■ Appellant contends that because the statutory provision under which her guardianship was commenced in 1952 has since been repealed, the guardianship has been terminated. Respondent challenges appellant's reading as overly simplistic and unable to survive close scrutiny.

In its 1952 warrant of commitment, the court found appellant mentally deficient, and ordered

that the Director of Public Institutions is hereby appointed guardian of the person of such patient, and that she is hereby committed to its care and custody according to law.

The commitment provisions at that time were found at Minn.Stat. §§ 525.749–.79 (1949). Minn.Stat. § 525.753, subd. 2 (1949) stated:

If the patient is found to be mentally deficient or epileptic, the court shall appoint the director guardian of his person

---

**2.** The Commissioner of Human Services is currently vested with the powers and duties of the Director of Public Institutions, including those associated with public guardianship. *See* Minn. Stat. § 246.01 (1990).

and commit him to the care and custody of such director.

These provisions were repealed in 1968. 1967 Minn.Laws ch. 638, §§ 22, 23.

Separate statutory provisions addressed the general powers and duties of guardians. *See* Minn.Stat. §§ 525.54–.612 (1949). These provisions are still in effect today. *See* Minn.Stat. §§ 525.539–.705 (1990 and Supp.1991); *see also* Minn.Stat. ch. 252A (1990) (public guardianship).

Minn.Stat. §§ 525.749–.79 were repealed in 1968 and replaced by Minn.Stat. ch. 253A. 1967 Minn. Laws ch. 638, §§ 1–23. Chapter 253A included a savings clause, which addressed which law should govern commitments made under prior law:

> [A] proceeding for the commitment of a person to a hospital commenced before January 1, 1968 is governed by the law existing at the time the proceeding was commenced, and unless such proceedings are terminated within 12 months after January 1, 1968, they shall thereafter be governed by the provisions of sections 253A.01 to 253A.21.

Minn.Stat. § 253A.21, subd. 7 (1967).

Appellant contends that because chapter 253A contained no provisions for public guardianships and because under the savings clause, Minn.Stat. § 253A.21, subd. 7, her 1952 commitment became a commitment governed by chapter 253A, the Commissioner could no longer rely upon Minn. Stat. § 525.753, subd. 2 as the basis for the guardianship. We disagree. The savings clause does not provide that the guardianships of those individuals who were made public wards pursuant to section 525.753, subd. 2, were to be terminated. Instead, it addressed only the commitment status of previously committed individuals. The fact that the statute which created the guardianship was repealed does not mean the guardianships created by statutory provisions were terminated. This is particularly true when the powers and duties of the Commissioner as public guardian remained intact. *See* Minn.Stat. §§ 525.54–612 (1967); *see also* Minn.Stat. ch. 252A (1990).

Further, Minn.Stat. § 253A.18, subd. 2 (1967) authorized the commencement of guardianship proceedings "before, during, or after commitment proceedings," and provided that such proceedings "may be conducted jointly with such commitment proceedings." With this provision, the legislature recognized that guardianships had been and would continue to be an adjunct to commitment. The adoption of chapter 253A merely established that guardianships of persons with developmental disabilities were to be governed pursuant to the guardianship provisions of Minn.Stat. §§ 525.54–.612 rather than by the commitment provisions.

Chapter 253A in turn was repealed, and the current commitment statute, chapter 253B, was enacted. 1982 Minn.Laws ch. 581. Appellant contends the savings clause of chapter 253B addressed commitments, but again did not provide for the Commissioner to be guardian of appellant's person. Respondent contends that the savings clause refutes, rather than supports, appellant's argument.

The legislature addressed the issue of individuals who were held under a guardianship, and required new commitment proceedings under chapter 253B. *See In re Cieminski*, 374 N.W.2d 289, 291 (Minn. App.1985), *pet. for rev. denied* (Minn. Nov. 18, 1985). The savings clause, which was amended twice, ultimately read, in relevant part, as follows:

> For persons 16 years or older, involuntarily residing in a regional center pursuant to an order of guardianship, and not committed pursuant to an order issued under Minnesota Statutes, chapter 253B, or Minnesota Statutes 1980, chapter 253A, the following review procedures will apply:
>
> (a) The person shall have a commitment hearing according to Minnesota Statutes, section 253B.08, prior to August 1, 1985. The head of the regional center shall notify the responsible county which shall initiate the petition for commitment.
>
> *  *  *  *  *  *
>
> (c) A finding by the committing court that the individual does not satisfy the

commitment criteria of Minnesota Statutes, chapter 253B, *shall not terminate the guardianship or constitute a restoration to capacity. An order of restoration to capacity may only be obtained under Minnesota Statutes, section 525.61.*

1984 Minn.Laws ch. 623, § 10 (emphasis added). The emphasized provision indicates the legislature's recognition that guardianships would continue to exist until terminated pursuant to the applicable provisions of the general guardianship statutes of chapter 525.

Appellant was recommitted pursuant to a March 8, 1984 court order, but her guardianship was never terminated. Neither the repeal of the statute under which appellant's guardianship was commenced, Minn. Stat. § 525.753, subd. 2, nor the repeal of chapter 253A served to terminate appellant's guardianship. Only a petition for restoration of capacity under one of several relevant statutes would have this effect. *See* Minn.Stat. § 252A.19, subd. 2 (1990) (petition to remove public guardian and restore ward to capacity); Minn.Stat. § 525.-61, subd. 1 (1990) (petition to restore person under guardianship to capacity); Minn.Stat. § 525.611 (1949) (petition to discharge Commissioner of Public Welfare as guardian) (repealed 1980 Minn.Laws ch. 493, § 40); Minn.Stat. § 525.78, subd. 5 (1949) (petition by director to restore person committed to guardianship to capacity) (repealed 1967 Minn.Laws ch. 638, § 22). Therefore, we hold appellant's guardianship remains in effect until, pursuant to a petition, a court orders that she is restored to capacity.

## II.

■ Appellant next challenges the administration of neuroleptic medication to her, absent a court order or consent of a guardian ad litem. She contends that even if a valid guardianship exists, her constitutional rights are violated when she is treated with neuroleptic medication with only the consent of the public guardian pursuant to Minn.Stat. § 253B.03, subd. 6a (Supp.1991). She argues that a conflict of interest exists where the state, through the

Commissioner as guardian, authorizes another state employee to administer medication. The Commissioner responds that ample safeguards already exist and that no conflict exists where the county social services agency acts as public guardian.

■ We observe, initially, that the Commissioner seeks dismissal of the appeal of this issue as moot, since appellant no longer resides at the Regional Treatment Center, and the Commissioner no longer administers neuroleptic medication. These two circumstances tend to support dismissal on the basis of mootness. *See In re Schmidt,* 443 N.W.2d 824, 826 (Minn.1989). However, because Minn.Stat. § 525.56, subd. 3(1) (1990) authorizes a guardian to admit a ward to a regional treatment center to receive temporary care, for a period not to exceed 90 days in any calendar year, and because neuroleptic medications may be given during the 90–day temporary stay, we conclude that this issue of whether a state appointed guardian may constitutionally consent to administration of such medications may recur and yet may evade review. *See Schmidt,* 443 N.W.2d at 826. Thus, we shall address this issue on its merits.

In *Jarvis v. Levine,* 418 N.W.2d 139, 150 (Minn.1988), the supreme court held that medical authorities seeking to administer neuroleptic medication to individuals who were involuntarily committed as mentally ill must first obtain pretreatment judicial review. The legislature adopted procedures to be employed in the administration of neuroleptic medication to mentally ill, committed persons. 1988 Minn.Laws ch. 689, art. 2, § 119. This provision is presently found in Minn.Stat. § 253B.03, subd. 6c (Supp.1991).

In 1987, the legislature promulgated a statute specifically addressing administration of neuroleptic medications to mentally retarded patients. 1987 Minn.Laws ch. 185, art. 2, § 3. Under this provision, a patient who is mentally retarded or the patient's guardian has the right to give or withhold consent before psychotropic medication is administered. *Id.* This provision is currently found at Minn.Stat. § 253B.03,

subd. 6a(2) (Supp.1991). Appellant does not contend that the procedure mandated by the statute was not followed. Instead, she argues that her constitutional rights are violated when the neuroleptic medication is administered without court approval or the approval of a guardian ad litem. We discern no constitutional violation here.

There is a distinction between the procedures addressed in *Jarvis* and the treatment of developmentally disabled persons with neuroleptic medications pursuant to Minn.Stat. § 253B.03, subd. 6a. Our review of the case law demonstrates that challenges to the constitutionality of application of neuroleptic medications arose primarily in the context of utilizing these intrusive treatment methods upon the unfettered discretion of medical personnel. *See, e.g., Jarvis,* 418 N.W.2d at 148; *In re Schmidt,* 443 N.W.2d at 827. In *Schmidt,* the supreme court upheld the constitutionality of a statute which permitted application of neuroleptic medications to incompetent mentally ill patients upon consent of a guardian ad litem, observing that the statute:

> facially provides to the patient, in substance, a procedure which protects the patient from the exercise of sole unrestrained discretion of the medical personnel at our state hospitals with respect to the use of such invasive procedures. The statute, therefore, attempts to address the concerns we expressed in *Price*—that the imposition of an intrusive form of treatment, such as this, must not rest solely in the discretion of the medical personnel at the state institution.

*Id.*

Because under section 253B.03, subd. 6a, consent to administer neuroleptic medications may be either given or withheld by the ward or the guardian, there should be no concern that unrestrained discretion of medical personnel will be exercised in these matters. We conclude that appellant's constitutional rights are safeguarded without the necessity of additional consent by a guardian ad litem.

Appellant raises an additional constitutional concern, however, in her argument that "[e]veryone involved in giving consent to neuroleptic medications for the alleged wards of the state is either an employee of the State of Minnesota or an employee of the county serving the ward's case." Appellant urges that the relationship constitutes a conflict of interest and prohibits mentally retarded individuals from receiving advocacy for their rights as fully and effectively as those individuals who have the protections of a *Jarvis* hearing.

We agree with the dissent that in *Price v. Sheppard,* 307 Minn. 250, 262 n. 11, 239 N.W.2d 905, 913 n. 11 (1976), the supreme court recognized that the guardian ad litem, who is to represent the interests of the patient as well as the guardian, who could otherwise consent to intrusive treatment, should not also be the person responsible for the patient's commitment.

However, the sparse record before us demonstrates no indication or suggestion that a conflict, in fact, exists. Neither is there any indication in the record before us that the freedom of the public guardian, in this case the Ramsey County social worker, to make an informed judgment on behalf of Blilie has ever been limited formally or informally by the Commissioner's responsibility to operate a Regional Treatment Center such as Cambridge.

We further note that the patient's public guardian is statutorily assigned a wide range of duties and powers with regard to the ward. *See* Minn.Stat. §§ 252A.111, 525.56, subds. 1–3 (1990). Such a guardian will consequently have much broader knowledge of the ward, and the appropriateness of intrusive treatment, than would a guardian ad litem, who is appointed in *Jarvis* hearings to represent the interests of the patient only with regard to administration of neuroleptic medication. *See Jarvis,* 418 N.W.2d at 144; Minn.Stat. § 253B.03, subd. 6c(d)(2) (Supp.1991).

We note, further, that certain safeguards to ensure the independence of a public guardian are in place both pursuant to statute and Department of Human Services procedures. For instance, only a county

social worker other than the ward's case manager may act as guardian when providing or denying informed consent to administer neuroleptic medications. *See* Minn. Stat. § 252A.21, subd. 2 (1990); *Crawford v. Minnesota Dept. of Human Servs.*, 468 N.W.2d 583, 587 (Minn.App.1991). Under Department of Human Services procedures, the county social workers are also directed to consult with the ward's family and are encouraged to seek a second medical opinion if deemed necessary.

Finally, Minn.Stat. § 252A.19, subd. 2 (1990), authorizes anyone, including counsel for the person with the developmental disabilities, to petition the court for review of any decision made by the public guardian. Thus, any time any person questions the consent given by the public guardian for treatment with neuroleptic medication, a hearing can be obtained before the court on the appropriateness of the decision. *See id.; see also Harhut*, 385 N.W.2d at 312 (setting out procedural safeguards for indeterminately committed mentally retarded individual, including representation by informed attorney, periodic medical reviews sent to court and counsel, annual medical review, and judicial review at least once every three years). The supreme court has held that a trial court's refusal to appoint a guardian ad litem to represent a patient indeterminately committed as mentally retarded did not violate her constitutional rights, when the patient is represented by counsel, unless the representation is ineffective for some reason. *In re Fredrickson*, 388 N.W.2d 717, 722 (Minn.1986). In this case, the failure to appoint a guardian ad litem also did not violate Blilie's constitutional rights.

On the limited record before us, we can discern no unconstitutionality in permitting public guardians to consent on behalf of wards to the administration of neuroleptic medications.

### III.

■ Appellant next argues that the trial court erred when it denied her petition to require appropriate placement. Appellant contends she has been held at Cambridge without authority since March 12, 1990, when her commitment expired. However, this court has been informed that as of January 3, 1992, appellant is no longer residing in Cambridge or any other state-operated facility, and has been transferred to a community placement. Ramsey County has informed this court it would stipulate to withdrawal of the most recent petition for commitment. The placement issue is moot, and this court will not address it.

■ Finally, appellant moves to strike references in the record to certain affidavits, contending she objected to those below and that they were not a part of the evidentiary record below. Documents which were not part of the record below may not be considered on appeal. *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988). The trial court did not explicitly rule on whether these affidavits should be received into evidence or not. In any event, we do not consider them.

### DECISION

The decision of the trial court denying appellant's petition for a declaratory judgment that the original appointment of the Commissioner of Human Services as guardian of appellant was terminated in 1968 by repeal of Minn.Stat. § 525.753 (1949) is affirmed. The decision of the trial court that neuroleptic medication may be administered to a ward upon the consent of the ward or her guardian under Minn.Stat. § 253B.03, subd. 6a (Supp.1991) is affirmed. The issue of whether the trial court erred in denying the petition of appellant to require appropriate placement is moot.

Affirmed.

SHORT, Judge (dissenting).

I dissent on the issue of whether a public guardian can authorize the administration of neuroleptic medication to a mentally retarded person absent appointment of a guardian ad litem and a court order. The holding in *Jarvis v. Levine*, 418 N.W.2d 139, 147–49 (Minn.1988), *reh'g denied* (Aug. 22, 1988) that there be prior judicial

approval for the involuntary administration of neuroleptic medications is based on the Minnesota Constitution, not the commitment statutes. *In Re Chonis,* 478 N.W.2d 199, 200 (Minn.1991). While I agree Minn. Stat. § 253B.03, subd. 6a (Supp.1991) can be read to include consent from a public guardian, I believe the Minnesota Constitution requires appointment of a guardian ad litem and an adversary proceeding. *See Price v. Sheppard,* 307 Minn. 250, 262–63, 239 N.W.2d 905, 913 (1976).

The Commissioner's efforts to establish separate decision makers (whereby the hospital medical staff requests use of neuroleptics and a county social worker approves such use) are insufficient to satisfy the procedural requirements of the Minnesota Constitution under *Jarvis* and *Price.* In particular, the interests of the patient are inadequately protected where the imposition of an intrusive form of treatment such as the unwanted administration of neuroleptic medication rests ultimately in the discretion of the official charged with administration of the state hospital system. *See Jarvis,* 418 N.W.2d at 144–47 (Minnesota Constitution requires that as part of the judicial review to be conducted before involuntary administration of neuroleptic medication, the court shall appoint a guardian ad litem to represent the interests of the patient and conduct an adversary proceeding to determine the necessity and reasonableness of the prescribed treatment); *Price,* 307 Minn. at 262 n. 11, 239 N.W.2d at 913 n. 11 (those considered for appointment as guardian ad litem should not include those responsible for the patient's commitment). I would reverse the trial court's denial of Blilie's petition on this issue and enjoin the state from administering neuroleptic medications to mentally retarded patients without appointment of a guardian ad litem and a court order.